2005 NMCA 061
ERMELINDA WILLIAMS, NASARIO LOPEZ, LILLIAN STARZYK, OLIVAMA SANDOVAL, and ERLINDA TRUJILLO, on their own behalves and as Representatives of a class of similarly situated persons, Plaintiffs-Appellants,
v.
MICHAEL W. STEWART, M.D., Defendant-Appellee.
Docket No. 23,730.
Court of Appeals of New Mexico.
Corrected: June 8, 2005.
Certiorari Denied, No. 29,167, May 10, 2005.
Filing Date: March 22, 2005.
Richard W. Hughes, Caren I. Friedman, Rothstein, Donatelli, Hughes, Dahlstrom & Schoenburg, LLP, Santa Fe, NM, John C. Bienvenu, Santa Fe, NM, for Appellants.
Robin A. Goble, Alice Tomlinson Lorenz, Gary L. Gordon, Miller Stratvert P.A., Albuquerque, NM, for Appellee.

OPINION
WECHSLER, Judge.
{1} This is an appeal from an order granting summary judgment and dismissing a class action lawsuit. The issues primarily concern the application of the discovery rule. The essential elements of fraud are also at issue. Under the circumstances presented, we conclude that publicity concerning a program to use body parts removed in autopsies did not give rise to a duty to inquire as a matter of law and that the district court therefore erred in determining that the statute of limitations bars the claims asserted. Additionally, we hold that fraud was not adequately pleaded because emotional distress damages are not recoverable as part of the fraud claim. We reverse and remand for further proceedings.

Background
{2} This lawsuit arises out of a program that the Los Alamos National Laboratory (LANL) conducted from 1959 through the early 1980s. LANL arranged with the Los Alamos Medical Center (LAMC) and several of its pathologists to have organs, tissues, and other body parts removed in the course of autopsies performed at LAMC and other area hospitals. The body parts were then delivered to LANL so that their plutonium content could be studied. In total, body parts from 407 individuals (the decedents) were collected as part of this program.
{3} It appears that little or no effort was made to obtain the informed consent either of the decedents before their deaths or their families. Further, neither the existence of the program nor its purposes were publicly disclosed until 1993, when a reporter obtained documents using the Freedom of Information Act (FOIA). See generally 5 U.S.C. § 552 (2002).
{4} Plaintiffs filed this class action lawsuit on October 15, 1996, roughly three years after the FOIA disclosure. Initially, the class included the next of kin and/or the immediate family members of all the decedents who were involved in the program. The Regents of the University of California, as operator of LANL, and Lutheran Hospitals & Homes Society of America, Inc., as operator of LAMC, were among the original defendants. The first complaint sought damages for intentional infliction of emotional distress, conversion, fraud, negligence, and civil rights violations. After discovery had been conducted and additional information had been gathered about the program, Plaintiffs obtained leave to amend their complaint to join Dr. Michael W. Stewart as an additional defendant and to add claims for mistreatment of a corpse, breach of contract, civil conspiracy, and aiding and abetting.
{5} The defendants filed a number of motions to dismiss and for summary judgment. The district court dismissed many of the claims, including the claim for fraud. However, the claims for intentional infliction of emotional distress, negligence, mistreatment of a corpse, civil conspiracy, and aiding and abetting remained.
{6} Following protracted negotiations, Plaintiffs obtained settlements with all defendants except Dr. Stewart. The parties agree that a de facto sub-class was thereby created consisting of only those members of the original class who were related to the decedents autopsied during Dr. Stewart's tenure at LAMC (Plaintiffs).
{7} As the only remaining party-defendant, Dr. Stewart moved the district court to reconsider a motion for summary judgment that he had previously filed, contending that Plaintiffs' claims against him were barred by the statute of limitations. He based his argument on media coverage relating to the program, including television programs and newspaper articles that were published from the 1980s through the mid-1990s. The district court determined as a matter of law that, in light of this publicity, Plaintiffs should have discovered their claims by June 1995. Because Dr. Stewart was not joined as a party until May 1999, the district court concluded that all Plaintiffs' remaining claims were barred. Plaintiffs appealed. Standard of Review
{8} The district court's ruling on the statute of limitations issue presents a question of law that we review de novo. See Bartlett v. Mirabal, 2000-NMCA-036, ¶ 4, 128 N.M. 830, 999 P.2d 1062 (observing that the grant of a motion for summary judgment presents a question of law, which is reviewed de novo). We must review the record in the light most favorable to the non-movant to determine whether there are genuine issues of material fact. Handmaker v. Henney, 1999-NMSC-043, ¶ 18, 128 N.M. 328, 992 P.2d 879.
{9} The district court's dismissal of Plaintiffs' fraud claims also presents a question of law to be reviewed de novo. See City of Sunland Park v. Macias, 2003-NMCA-098, ¶ 9, 134 N.M. 216, 75 P.3d 816.
For purposes of a motion to dismiss, we accept all well-pleaded facts as true and consider whether the plaintiff might prevail under any state of facts provable under the claim. A complaint should not be dismissed unless there is a total failure to allege some matter essential to the relief sought.
Id. (citation omitted).

Statute of Limitations

A. Classification and Accrual of the Causes of Action
{10} The district court and the parties have proceeded on the theory that Plaintiffs' claims for intentional infliction of emotional distress, negligence, mistreatment of a corpse, civil conspiracy, and aiding and abetting are classifiable as claims for personal injuries, such that the three-year statute of limitations applies. See NMSA 1978, § 37-1-8 (1976) ("Actions must be brought . . . for an injury to the person . . . within three years."). In light of Plaintiffs' prayer for damages, by which they primarily seek to recover for pain, suffering, physical injuries, and the emotional distress that they have suffered, we agree with this characterization. See Mantz v. Follingstad, 84 N.M. 473, 478-79, 505 P.2d 68, 73-74 (Ct. App. 1972) (observing that if the object is the recovery of damages for personal injury, the statute of limitations for personal injury claims applies regardless of the form of the claim); cf. Jacobs v. Meister, 108 N.M. 488, 495, 775 P.2d 254, 261 (Ct. App. 1989) (stating that "[d]istress is a personal injury familiar to the law") (internal quotation marks and citation omitted).
{11} Depending on the nature of the claims asserted and the context out of which they arise, personal injury claims may accrue at the time of the occurrence, the time of injury, or the time of discovery. Dr. Stewart does not contest that the time of discovery applies in this case. We therefore apply the discovery rule for our analyses. See Cummings v. X-Ray Assocs. of N.M., P.C., 1996-NMSC-035, ¶ 49, 121 N.M. 821, 918 P.2d 1321 ("A statute of limitations begins to run when the cause of action accrues, the accrual date usually being the date of discovery."); see also Roberts v. Southwest Cmty. Health Servs., 114 N.M. 248, 255-56, 837 P.2d 442, 449-50 (1992) (acknowledging the widespread adoption of the discovery rule, as well as the various policy considerations that support it).

B. Application of the Discovery Rule
{12} The discovery rule provides that "the cause of action accrues when the plaintiff discovers or with reasonable diligence should have discovered that a claim exists." Id. at 255, 837 P.2d at 449. There has been no suggestion that Plaintiffs had actual knowledge of their claims more than three years before the complaint was filed. Instead, the parties dispute whether Plaintiffs "should have discovered" their claims at an earlier date.
{13} The district court concluded that Plaintiffs should have discovered the basis for their claims by June 1995 in light of the publicity that the program received. The evidence supporting this determination included newspaper articles published in The New York Times, The Albuquerque Tribune, the Los Alamos Monitor, the Albuquerque Journal, and The Santa Fe New Mexican, describing the program or other related studies with varying degrees of specificity. Associated Press releases appeared in a number of out-of-state publications. Several television programs aired, including features on 60 Minutes, The Geraldo Rivera Show, and ABC World News Tonight. Finally, several scientific publications described aspects of the program, and there was also a presidential advisory committee report.
{14} The discovery rule carries an inquiry obligation. A plaintiff must exercise reasonable diligence to discover a claim. Id. The standard of "reasonable diligence" imports an analysis of objectivity. See, e.g., Martinez v. Showa Denko, K.K., 1998-NMCA-111, ¶ 24, 125 N.M. 615, 964 P.2d 176 (stating that tolling of the statute of limitations ends when a plaintiff "acquires knowledge of facts, conditions, or circumstances which would cause a reasonable person to make an inquiry leading to the discovery of the concealed cause of action") (internal quotation marks and citation omitted). Under this standard, Plaintiffs had an obligation to inquire as to facts that would indicate they had a claim if the publicity reached a level that would objectively make a reasonable person inquire as to the presence of a claim. See id. ¶ 25 (holding that information the plaintiff received from family, newspaper articles, doctors, and her attorney constituted sufficient information to put a reasonable person on notice and imposed a duty on the plaintiff to timely file a claim).
{15} Courts applying this standard have reached different results. By way of example, Dr. Stewart directs our attention to Ball v. Union Carbide Corp., 385 F.3d 713 (6th Cir. 2004), in which the Sixth Circuit held that the plaintiffs had a duty to inquire about potential personal injury claims connected to emissions or releases of local nuclear weapons manufacturing and research facilities based on repeated local and national news media reports and repeated reports of a governmental panel studying the health effects of the operation of the facilities. Id. at 721-23; see also Hughes v. Vanderbilt Univ., 215 F.3d 543, 548 (6th Cir. 2000) (holding that numerous news reports, including report on similar lawsuit, placed the plaintiff on constructive notice of underlying events even though she did not hear or read any of the reports); In re: Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Prods. Liab. Litig., ___ F.3d ___ (2004 WL 1535828, at ** 7, 8)(E.D. Pa. July 6, 2004) (holding that plaintiffs were on inquiry notice that their alleged heart problems were related to diet drugs based on the widespread publicity concerning recall of diet drugs and nationwide class action settlement agreement). On the other hand, in O'Connor v. Boeing North American, Inc., 311 F.3d 1139, 1149-52 (9th Cir. 2002), the Ninth Circuit held that "numerous and notorious" newspaper reports concerning the release of potentially hazardous substances did not preclude the possibility that a reasonably diligent person in the locale might not have been aware of the release of the contaminants. The Court stated that such a determination
required a fact-intensive examination of the geographic scope of the circulation of various publications, the level of saturation of each publication within the relevant communities, the frequency with which articles . . . appeared in each publication, the prominence of those articles within the publication, and the likelihood that a reasonable person living in [p]laintiffs' various communities at the same time as [p]laintiffs would have read such articles.
Id. at 1152. It concluded that such issues were within the purview of a jury. Id.; see also Bibeau v. Pac. Northwest Research Found. Inc., 188 F.3d 1105, 1110-11 (9th Cir. 1999) (holding that duty of inquiry under discovery rule not triggered by news articles of experiment causing injury without consideration of reasons plaintiff may not have read the articles); Orlikow v. United States, 682 F. Supp. 77, 85 (D.D.C. 1988) ("Without actual notice or without having read the articles it would go too far to state that the statute of limitations began to run when the articles were published. The trier of fact must resolve the issue of diligence and notice.") (footnote omitted).
{16} Historically, the courts of this state have characterized the application of the discovery rule as a jury question, particularly when conflicting inferences may be drawn. See, e.g., Roberts, 114 N.M. at 257, 837 P.2d at 451) (concluding, in a medical malpractice case involving the discovery rule, "that whether plaintiff . . . with reasonable diligence should have known of the injury and its cause is a question of fact"); Brown v. Behles & Davis, 2004-NMCA-028, ¶¶ 12, 17, 135 N.M. 180, 86 P.3d 605 (observing that the application of the discovery rule is generally a question of fact and holding that whether a reasonable person would have investigated the public records and discovered the basis for a legal malpractice claim is a question for the jury); Kevin J. v. Sager, 2000-NMCA-012, ¶ 20, 128 N.M. 794, 999 P.2d 1026 ("Because there are differing permissible inferences that the fact finder could make . . . summary judgment was not proper in this case. The question of when [p]laintiff knew or had reason to know of the alleged abuse and its impact is a question for the jury to decide."); Montoya v. Kirk-Mayer, Inc., 120 N.M. 550, 554, 903 P.2d 861, 865 (Ct. App. 1995) (stating that summary judgment is improper when equally logical but conflicting inferences can be drawn from undisputable basic facts); cf. Romero v. Sanchez, 83 N.M. 358, 362, 492 P.2d 140, 144 (1971) (holding, in a case involving an action to set aside a deed on grounds of fraud, that whether the claimant should, in the exercise of ordinary diligence, have investigated the public records raises a question of fact); Medina v. Fuller, 1999-NMCA-011, ¶ 22, 126 N.M. 460, 971 P.2d 851 (holding that "[w]here there are disputed questions of material fact as to whether a plaintiff is barred by the statute of limitations, these questions are to be decided by a jury") (internal quotation marks and citation omitted).
{17} In this case, Dr. Stewart attached written copies of the articles and transcripts of the various publicity concerning the program, but did not present evidence addressing other facts which would allow a factfinder to determine the level of awareness the publicity would generate to a reasonable person in Plaintiffs' communities. Without this type of information, we believe that a reasonable inference could be reached that the publicity did not generate a duty to inquire on the part of a reasonable diligent person in Plaintiffs' situation in Plaintiffs' communities. We note that some of the Plaintiffs are elderly and live in a small, isolated village in Northern New Mexico and at least one is primarily Spanish speaking and claimed that he could not have understood the publicity without an interpreter.
{18} Moreover, the impact of the publicity raises additional questions of fact. As mentioned above, the various articles, reports, and broadcasts describe the program with varying degrees of specificity. Much of the publicity appears to have been lacking pertinent details, such as the secretive nature of the program and LANL's failure to obtain informed consent. As such, it remains an open question whether reasonably prudent persons in Plaintiffs' position would have realized that their decedents might have been involved with the program. Cf. Brown, 2004-NMCA-028, ¶ 17 (holding that even if the claimant was on inquiry notice, it was nevertheless a question for the jury whether a search of the records would have revealed the basis for the claim).
{19} In addition, the summary judgment record does not lead to the single conclusion that a reasonably diligent person who made inquiry based upon the publicity would have learned of a claim. See O'Connor, 311 F.3d at 1155-56 (stating that application of discovery rule requires that reasonable inquiry provide notice of claim). At oral argument, Dr. Stewart's counsel provided the following scenario leading from the available publicity in 1994 to notice of a claim. February 1994 articles in The Albuquerque Tribune and the Los Alamos Monitor stated that Dr. Stewart performed autopsies as part of the program in the relevant time period. The article in The Albuquerque Tribune indicated that information was published in scientific studies. The Albuquerque Tribune published an article the following day stating that autopsies of the general population were performed at LAMC. Three additional articles in February 1994 discussing autopsies of persons not part of Plaintiffs' class indicated that family members had not given permission to remove and study body parts of the deceased. The Santa Fe New Mexican published several articles on the program during February through April 1994. It stated that a congressional committee was investigating whether permission had been granted for the use of the body parts in the program. The Associated Press then picked up the story, and articles were published nationwide. The Albuquerque Journal carried an article in August 1994. According to Dr. Stewart's counsel, Plaintiffs could have gone to the scientific studies, which were not classified, to identify the personal characteristics and date of death of their decedents to learn of their involvement in the program.
{20} Dr. Stewart's argument requires a plaintiff to track through various information sources in order to reach the point of knowledge sufficient to form a belief that the plaintiff may have a claim. Moreover, for Plaintiffs to even understand that they had a claim, they would need to suspect that an autopsy had been performed on their relative. By its very nature, information about the autopsy of a deceased relative is not readily understood or conceptualized. Consequently, we consider Dr. Stewart's reasoning too tenuous to conclude that the sole reasonable inference is that an inquiry would necessarily lead to sufficient notice.
{21} Therefore, we conclude that the district court erred in ruling that Plaintiffs' claims are time barred as a matter of law. We acknowledge that the application of the discovery rule may be summarily resolved in exceptional cases. See Brunacini v. Kavanagh, 117 N.M. 122, 127, 869 P.2d 821, 826 (Ct. App. 1993) ("Although the time when a party is deemed to have discovered [the basis for a claim] is generally a question of fact, nevertheless, where the undisputed facts show that [p]laintiffs knew, or should have been aware of the negligent conduct on or before a specific date, the issue may be decided as a matter of law."). However, we see nothing to take this case outside of the general rule. The issue of whether, in the exercise of reasonable diligence, Plaintiffs should have made themselves aware of the foregoing articles, broadcasts, and reports is a question of fact for the jury to decide. Similarly, the jury should be permitted to determine whether Plaintiffs should have discovered the basis for their claims in a more timely fashion by virtue of the publicity.

C. Consideration of Alternative Bases for Affirmance
{22} Dr. Stewart suggests several alternative bases for affirmance of the district court's order. Although we may affirm a district court ruling on grounds that differ from the theory relied upon below, we only do so when it is fair to the appellant. See State v. Franks, 119 N.M. 174, 177, 889 P.2d 209, 212 (Ct. App. 1994). "Only rarely will it be fair to affirm on a ground that was not raised in the lower court." Rupp v. Hurley, 1999-NMCA-057, ¶ 25, 127 N.M. 222, 979 P.2d 733.

1. Standing
{23} Dr. Stewart argues that certain class representatives lack standing because they did not execute a consent form for the performance of an autopsy. Because standing is jurisdictional, Dr. Stewart's apparent failure to raise this issue below does not prevent consideration of it on appeal. See Town of Mesilla v. City of Las Cruces, 120 N.M. 69, 70, 898 P.2d 121, 122 (Ct. App. 1995) (providing that "standing is a jurisdictional question that may be raised at any time") (internal quotation marks and citation omitted).
{24} However, even when issues may be raised for the first time on appeal, issues that rely on facts may not be reviewable based on the state of the record. Cf. State v. Wood, 117 N.M. 682, 687, 875 P.2d 1113, 1118 (Ct. App. 1994) (declining to review an issue that is permitted to be raised for the first time on appeal due to the lack of a factual basis in the record). In this case, because standing was not raised below, Plaintiffs were not on notice that they had to introduce facts relevant to the issue. As a result, we believe it would be unfair to address Dr. Stewart's issue, based on facts offered below for a different purpose, to hold that Plaintiffs lack standing. See Eldin v. Farmers Alliance Mut. Ins. Co., 119 N.M. 370, 376, 890 P.2d 823, 829 (Ct. App. 1994)

2. Existence of a Legal Duty of Care
{25} In his briefs to this Court, Dr. Stewart contends that Plaintiffs' claims hinge on medical forms used by LAMC to obtain consent to perform autopsies. Because only one of the class representatives was a signatory to one of these authorization forms, Dr. Stewart argues that most of the class representatives lack standing to pursue claims against him.
{26} Dr. Stewart's argument conflates two distinct legal issues. Standing requires injury in fact, causation, and likelihood of redress. John Does I Through III v. Roman Catholic Church of the Archdiocese of Santa Fe, Inc., 1996-NMCA-094, ¶ 28, 122 N.M. 307, 924 P.2d 273. Our limited review of Plaintiffs' standing indicates that these elements are satisfied in this case based on the amended complaint. By contrast, Dr. Stewart's argument appears to be addressed to the question of legal duty. Specifically, we understand Dr. Stewart to contend that he did not owe a legal duty of care apart from any duty that might have arisen from the consent forms.
{27} This argument fails for two reasons. First, we find nothing in the amended complaint or the other pertinent pleadings to indicate that Plaintiffs' claims are predicated on the consent forms. Rather, Plaintiffs' tort claims appear to rest on the duty of ordinary care that applies generally to all foreseeable claimants, dependent on public policy considerations. See Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 7, 134 N.M. 43, 73 P.3d 181 (observing that the existence of a legal duty is dependent upon foreseeability and public policy). Plaintiffs also rely on Jaynes v. Strong-Thorne Mortuary, Inc., 1998-NMSC-004, ¶ 23, 124 N.M. 613, 954 P.2d 45 in which our Supreme Court stated that a duty of care is owed by those with custody of the dead to family members. See also Flores v. Baca, 117 N.M. 306, 310, 871 P.2d 962, 966 (1994). To the extent that consent is an issue, it appears to take the form of an affirmative defense. As such, it has no bearing on the immediate question of the existence of a duty.
{28} Second, Plaintiffs dispute Dr. Stewart's claim that consent forms were executed in all cases. Plaintiffs contend that a significant number of the decedents were "coroner's cases," in which no consent form was required or used. Accordingly, a genuine issue of material fact appears to exist, such that summary judgment could not properly have been granted on the consent theory. See Gardner-Zemke Co. v. State, 109 N.M. 729, 732, 790 P.2d 1010, 1013 (1990) ("If genuine controversy as to the facts exists, a motion for summary judgment should be denied and the factual issues should proceed to trial.").

3. Class Certification
{29} Dr. Stewart also attacks the validity of the class certification on two grounds. First, he suggests that the district court's failure to expressly certify Plaintiffs as a sub-class should prevent them from proceeding with the appeal. However, as stated above, the district court appears to have implicitly certified the sub-class when it authorized the settlements. Furthermore, Dr. Stewart points to no New Mexico authority indicating that the district court's failure to formally recognize the validity of the sub-class should prevent Plaintiffs from proceeding with an appeal from the dismissal of their claims. To the extent that Dr. Stewart invites this Court to adopt such a rule, we decline.
{30} Second, Dr. Stewart suggests that the de facto sub-class is overbroad and that application of the discovery rule will require such particularized inquiry with regard to each class member that it is no longer appropriate for the litigation to proceed as a class action. The district court implicitly rejected this argument when it concluded that common questions of fact and issues of law predominate over matters affecting individual class members. See generally Rule 1-023(B)(3) NMRA. We have previously acknowledged that the district courts are better situated to resolve such class certification issues. See Salcido v. Farmers Ins. Exch., 2004-NMCA-006, ¶ 11, 134 N.M. 797, 82 P.3d 968 (recognizing district court's discretion in adopting guidelines for appellate review of class certification). In light of this general rule, we are not inclined to second guess the district court's informed ruling on the matter and leave the resolution of these matters to the district court. See id. ¶ 28 ("The district court is better positioned to decide the fluid and factually sensitive class certification questions, and [w]e should err, if at all, on the side of allowing the district court an opportunity to fine-tune its class certification order.") (internal quotation marks and citation omitted).
{31} We therefore conclude that Plaintiffs' various tort claims were improperly dismissed and that Dr. Stewart's alternative arguments in support of the district court's ruling lack merit. With the application of the discovery rule, we need not address Plaintiffs' fraudulent concealment argument. In the amended complaint, Plaintiffs allege that the defendants' fraudulent concealment tolls the statute of limitations until the FOIA disclosure in 1993. The discovery rule issue in this case addresses the time Plaintiffs should have discovered that they had a claim against Dr. Stewart. Dr. Stewart does not argue that this time was before the FOIA disclosure. Because of the relative time periods embodied within the two issues, we consider the fraudulent concealment issue to be subsumed within the discovery rule issue and to be redundant in Plaintiffs' case. If further developments in the case demonstrate that the fraudulent concealment issue is not redundant, the district court may address the issue at that time.

Viability of the Fraud Claims
{32} Among the various causes of action in the amended complaint, Plaintiffs assert claims for fraud. The gravamen of these claims is that the defendants, including Dr. Stewart, fraudulently induced class members to consent to autopsies without disclosing the defendants' secret intent to remove and destroy body parts for purposes of scientific research unrelated to the cause of death. The district court dismissed these claims, apparently on the ground that an action for fraud cannot be maintained unless pecuniary losses are provable. Plaintiffs appeal this ruling.
{33} As an initial matter, Dr. Stewart contends that the viability of the fraud claims is not properly before this Court. Specifically, Dr. Stewart argues that Plaintiffs failed to perfect their appeal from the order dismissing their claims for fraud because that order was not attached to the notice of appeal. However, the Rules of Appellate Procedure merely require the final order to be attached. See Bd. of County Comm'rs v. Ogden, 117 N.M. 181, 184, 870 P.2d 143, 146 (Ct. App. 1994) ("As we read [Rule] 12-202(B) [NMRA], attachment of only the relevant final judgment perfects an appeal from any previous oral or written orders encompassed in that judgment, as long as error has otherwise been preserved."). Plaintiffs did attach a copy of the final order, by which summary judgment was granted as to all pending claims, and the case was dismissed. Their appeal from this order simultaneously perfected an appeal from the district court's previous interlocutory order dismissing the fraud claim. See id. (holding that attachment of the final order granting summary judgment was sufficient to perfect an appeal from a previous ruling on a motion to dismiss).
{34} The elements of fraud include (1) a misrepresentation of fact, (2) either knowledge of the falsity of the representation or recklessness on the part of the party making the misrepresentation, (3) intent to deceive and to induce reliance on the misrepresentation, and (4) detrimental reliance on the misrepresentation. See UJI 13-1633 NMRA; see also Unser v. Unser, 86 N.M. 648, 653-54, 526 P.2d 790, 795-96 (1974) (defining fraud as "a misrepresentation of a fact, known to be untrue by the maker, and made with an intent to deceive and to induce the other party to act upon it with the other party relying upon it to his injury or detriment"). UJI 13-1633 enables a party to recover damages proximately caused by fraud. Our case law provides, in the general sense, that a plaintiff alleging fraud may recover "such damages as are the direct and natural consequences" of the reliance on a fraudulent representation. Indus. Supply Co. v. Goen, 58 N.M. 738, 743, 276 P.2d 509, 512 (1954).
{35} As a general rule, emotional distress damages are not available in a fraud claim because of the lack of pecuniary loss. 2 Dan B. Dobbs, Law of Remedies § 9.2(4), at 560 (2d ed. 1993). The theory of the general rule is that fraud is an economic tort which protects economic interests, and other torts protect interests in personalty. As a result, even though fraudulent misrepresentation may cause emotional distress, such distress has not generally been recognized as an element of damage. Id. The Restatement of Torts comports with this general rule. See generally Restatement (Second) of Torts § 525 (1977). New Mexico has not addressed the issue. Our cases involving actionable fraud have been commercial in nature, and the damage awards have been calculated accordingly. See, e.g., Register v. Roberson Constr. Co., 106 N.M. 243, 246-47, 741 P.2d 1364, 1367-68 (1987) (observing that either benefit of the bargain or out-of-pocket losses may constitute appropriate measures of damages for fraud); Chromo Mountain Ranch P'ship v. Gonzales, 101 N.M. 298, 300-01, 681 P.2d 724, 726-27 (1984) (upholding contract reformation and awarding interest in a constructive fraud case).
{36} Plaintiffs urge that we make an exception to the general rule based on Flores. In Flores, our Supreme Court recognized a claim for emotional distress damages in connection with the breach of a funeral and burial services contract. Flores, 117 N.M. at 308, 871 P.2d at 964. The Court reasoned, quoting Dobbs, Law of Remedies, that contracts for funeral and burial services are entered to provide well-being for survivors such that "emotional distress damages would seem to be recoverable" as "contemplated damages for a loss of that well-being in the event of breach." Id. at 311, 871 P.2d at 967 (internal quotation marks and citation omitted). Plaintiffs urge that we extend this approach to include not only breach of contract, but also the tort of fraud.
{37} We are not inclined to do so in this case. First, the approach set forth by Professor Dobbs is reasonable. As accepted by our Supreme Court, when parties to a contract contemplate the emotional distress damages, the contract would be frustrated unless such damages could be awarded upon breach. Id. In the tortious circumstances of fraudulent concealment as alleged in this case, there is no meeting of the minds or expression of the parties' intent as with a contract. Second, this case points out the difficulty with recognizing emotional distress damages for fraudulent concealment. Because a funeral and burial services contract contemplates the mental well-being of the living, it is possible to address damages with clarity in discussing the family's rights as intended third-party beneficiaries of the contract. Id. at 310-11, 871 P.2d at 966-67. The claim in this case does not present such clarity. Rather, we agree with the approach of Professor Dobbs that, in this case, fraud that "amounts to or is a part of a dignitary invasion such as a battery, an outrageous infliction of emotional distress, or a libel," allows a plaintiff to "recover emotional harm damages on such a theory, with recovery of purely economic damages on the fraud theory." Dobbs, supra, § 9.2(4), at 562.
{38} We are supported in this view by our Supreme Court's limitations in cases involving emotional distress. The tort of negligent infliction of emotional distress is "extremely narrow" and is limited to bystander recovery. See Fernandez v. Walgreen Hastings Co., 1998-NMSC-039, ¶ 6, 126 N.M. 263, 968 P.2d 774. The tort of intentional infliction of emotional distress requires extreme or outrageous conduct and severe distress. See Trujillo v. N. Rio Arriba Elec. Coop., Inc., 2002-NMSC-004, ¶ 25, 131 N.M. 607, 41 P.3d 333. We agree with Professor Dobbs that many of the cases seeming to allow emotional distress damages for fraud are actually not cases supporting the proposition that emotional distress damages are awardable without more on a fraud theory or are cases that contain little analysis. See Dobbs, supra, § 9.2(4), at 560. Therefore, we are hesitant to rely on them to effect a change in an area of the law that has been so carefully circumscribed by our Supreme Court. Moreover, to the extent that a case could be made for allowing the fraud claim to go forward with limitations analogous to those found in our Supreme Court cases, we believe that little of any practical effect would be accomplished, and we fear that such a holding might have unforeseen consequences of opening the door to emotional distress claims that should not be allowed for the same policy reasons expressed in our existing cases on emotional distress claims. See Trujillo, 2002-NMSC-004, ¶ 28.
{39} Plaintiffs have alleged claims of intentional infliction of emotional distress, negligence, mistreatment of a corpse, civil conspiracy, and aiding and abetting that remain viable in this case. The district court properly dismissed Plaintiffs' claims for fraud.

Conclusion
{40} We uphold the dismissal of Plaintiffs' claims for fraud. However, we conclude that the application of the statute of limitations presents a jury question. We therefore reverse and remand for further proceedings.
{41} IT IS SO ORDERED.
_________________________________
JAMES J. WECHSLER, Judge
I CONCUR:
_________________________________
LYNN PICKARD, Judge
MICHAEL E. VIGIL, Judge (concurring in part and dissenting in part).
VIGIL, Judge (concurring in part and dissenting in part).
{42} I concur with the majority opinion in all respects except its conclusion that the fraud claims were properly dismissed. Defendants obtained dismissal of the fraud claims pursuant to Rule 1-012(b)(6) NMRA on the basis that damages in a fraud action are limited to pecuniary, actual monetary losses, and plaintiffs only alleged they suffered non-pecuniary mental or emotional distress damages as a result of the fraud. No New Mexico case has ever limited fraud damages to pecuniary, actual monetary losses, and whether a claim for fraud is stated when only such damages are alleged is a question of first impression in New Mexico.
{43} Allowing the recovery of mental or emotional distress damages in appropriate cases is consistent with evolving New Mexico tort and contract law. In Flores, 117 N.M. at 314, 871 P.2d at 970, our Supreme Court held that where plaintiffs proved severe emotional distress, they were entitled to recover damages for mental anguish caused by a breach of a funeral contract.
{44} I agree that awarding mental and emotional distress damages in a fraud case should not be without limitations. However, the issue is before us pursuant to Rule 1-012(b)(6). A motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Rule 1-012(B)(6) tests the legal sufficiency of the complaint. "A motion to dismiss should be granted only when appears that the plaintiff is not entitled to recover under any facts provable under the complaint." Kirkpatrick v. Introspect Healthcare Corp., 114 N.M. 706, 709, 845 P.2d 800, 803 (1992); see Noriega v. Stahmann Farms, Inc., 113 N.M. 441, 442, 827 P.2d 156, 157 (Ct. App. 1992) ("A motion to dismiss for failure to state a claim should be granted only if it appears that plaintiff cannot recover, or be entitled to relief, under any state of facts provable under the complaint.").
{45} In this case Plaintiffs allege that Dr. Stewart and Defendants fraudulently induced them to authorize autopsies of their loved ones to determine the cause of death without disclosing their secret intent to remove and destroy body parts for purposes of scientific research unrelated to the cause of death. All the elements of a fraud claim under UJI 13-1633 are stated: (1) Defendants' misrepresentation of a fact; (2) Defendants' knowledge of the falsity of their representation; (3) Defendants' intent to deceive and induce reliance on the misrepresentation; and (4) detrimental reliance on the misrepresentation. See Unser, 86 N.M. at 653-54, 526 P.2d at 795-96. As to damages, UJI 13-1633 simply states, "[a] party is liable for damages proximately caused by [his] [her] fraudulent misrepresentation," and Plaintiffs allege, "[a]s a direct and proximate result of the fraud, [P]laintiffs and the members of the class have suffered damages, including loss, serious anguish, severe mental and emotional distress, pain, and suffering."
{46} Numerous decisions from many states have already held, in varying contexts, with various limitations, that mental or emotional distress damages are recoverable in a fraud action. See Steven J. Gaynor, Annotation, Fraud Actions: Right to Recover for Mental or Emotional Distress, 11 A.L.R.5th, 88 (1993). One approach to balancing the various interests is expressed by Andrew L. Merit, Damages for Emotional Distress in Fraud Litigation: Dignitary Torts in a Commercial Society, 42 Vand. L. Rev. 1, 1 (1989). Even the authority relied upon by the majority states, "[c]ases involving mishandling of dead bodies have long recognized emotional harm damages, fraud or no fraud." Dobbs, supra, § 9.2(4), at 565. Professor Dobbs concludes his discussion of this issue by stating,
There are assuredly cases in which some kind of intangible-harm damages should be awarded when the defendant's misconduct consists in part of fraudulent representations. Given the plenteous supply of tort doctrine for redress of emotional harm claims, however, there may be little or no need to add such a claim to fraud cases, where it would be quite likely to become a routine allegation. When it is coupled with punitive damages, it may, in addition, tend to weigh the misconduct twice. In any event, if emotional harm damages are to be permitted in fraud cases, it would be desirable to identify particular elements that especially justify such recovery. This might be done most readily by recognizing that the emotional harm recovery should be awarded when the elements of some other tort, such as intentional infliction of distress, can be shown, and that fraud itself would in some cases tend to show some of the elements of the intentional infliction tort.
Id.
{47} Since I am unable to agree with the majority that mental or emotional damages are never recoverable in any fraud case under any circumstances, I respectfully dissent from that portion of the opinion affirming dismissal of the fraud claims. In all other respects I agree with the majority.
_____________________________
MICHAEL E. VIGIL, Judge